# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:10-CV-139-DCK

| | |
|---|---|
| ANGELA SPAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| CELLCO PARTNERSHIP, d/b/a | ) |
| VERIZON WIRELESS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion For Summary Judgment" (Document No. 65). The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition. Having carefully considered the motion, the record, and applicable authority, the undersigned will grant the motion.

## I. PROCEDURAL BACKGROUND

Plaintiff Angela Spain ("Plaintiff") initiated this action on March 24, 2010 against Verizon Communications, Inc. and Cellco Partnership, d/b/a Verizon Wireless ("Defendant" or "Verizon"). Pursuant to the parties' "Joint Stipulation Of Partial Dismissal With Prejudice" (Document No. 21), Verizon Communications, Inc. was dismissed from this lawsuit on August 26, 2010. The parties further stipulated that Defendant could file a Second Amended Complaint. (Document No. 21).

"Plaintiff's Second Amended Complaint" (Document No. 22) ("Complaint") was filed on August 26, 2010, asserting claims for: (1) retaliation in violation of Title VII of the Civil Rights Act of 1964; (2) Unfair & Deceptive Trade Practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*; and (3) wrongful discharge in violation of public policy. On January 27, 2011, the undersigned held a status and motions hearing; at the conclusion of that hearing, the undersigned issued an oral order

granting Defendant's "Motion To Dismiss Second Amended Complaint" (Document No. 23) as to the unfair and deceptive trade practice claim, and denying the motion as to the retaliation and wrongful discharge claims.

On January 6, 2012, Defendant filed its "Motion For Summary Judgment" (Document No. 65) and accompanying "Memorandum In Support Of Defendant's Motion For Summary Judgment" (Document No. 66). After the undersigned granted a "Motion For Extension Of Time" (Document No. 67), Plaintiff filed a "Motion to Deny Defendant's Motion For Summary Judgment And Motion To Permit Depositions To Be Taken And Further Discovery" (Document No. 69). The undersigned denied the "Motion to Permit Depositions To Be Taken and Further Discovery" *without prejudice* because it was in violation of Local Rules 7.1(B), 7.1(C) and 7.1(C)(2), and construed the filing as Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Document No. 71). Defendant filed a timely "Reply To Plaintiff's Opposition To Motion For Summary Judgment" (Document No. 72) on February 27, 2012, and a corrected version (Document No. 73) on February 28, 2012. Plaintiff failed to renew her motion for additional depositions and/or discovery.

A hearing on Defendant's "Motion For Summary Judgment" (Document No. 65) was held on August 30, 2012. Based on the foregoing, the pending motion is now ripe for disposition.

## II. STANDARD OF REVIEW

The standard of review here is familiar. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

2

which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. "To resist summary judgment, a nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Francisco v. Verizon South, Inc., 442 Fed.Appx. 752, 754 (4th Cir. 2011) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F.Supp.2d 409 (W.D.N.C. 2011). The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. The nonmoving party "cannot defeat summary judgment with merely a scintilla of evidence." Francisco, 442 Fed.Appx. at 754 (quoting Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009)). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. Id.

### III. DISCUSSION

**A. Factual Background**

Plaintiff was hired by Defendant as a Customer Service Representative in Defendant's Murfreesboro, Tennessee Call Center ("Murfreesboro Call Center") in September 2003. (Document

3

No. 22, p.3; Document No. 66, p.3). Within months of being hired, Plaintiff complained to her supervisor Ms. Kelly Hurley ("Hurley") that the Murfreesboro Call Center was a "good ole boys club" and that she was being discriminated against because she was not getting promotions. (Document No. 66-1, p.14). Although Plaintiff acknowledges that Verizon's guidelines prohibit employees from applying for internal positions unless they have remained in their current position for at least one year, she claims this policy was "loosely enforced to allow exception to be made for certain employees." (Document No. 66, p.3; Document No. 66-2, p.59, Document No. 69-1, p.4).

In or about September 2004, after approximately one year of employment, Plaintiff's position was changed from "customer service representative" to "senior customer service representative" and she received a raise in pay. (Document No. 66-1, p.11). Plaintiff, however, did not view these changes in title and salary as a "promotion." Id.

Plaintiff testified in her deposition that she complained of gender discrimination approximately seven times during 2004-2005 to Hurley, Ms. Chris Taylor, and Mr. Mike Walbrecher because she was denied promotions. (Document No. 66-1, p.17). Nevertheless, on or about April 1, 2005, she was promoted to the position of Coordinator - Port Operations Desk at Murfreesboro, with another pay increase. (Document No. 66, p.3; Document No. 66-1, pp.23-25). During the majority of her time at this position she was supervised by Ms. Deborah Tucker. (Document No. 66-1, p.25). Although she alleges she was discriminated against based on her gender, Plaintiff was unable to recall how many of the supervisor positions she sought went to men, and how many went to women. (Document No. 66-1, pp.19-20).

In March 2006, Plaintiff was "promoted" to a network analyst position in Charlotte, North Carolina. (Document No. 66, p.4; Document No. 66-1, pp.26-28). Plaintiff was offered the new job in Charlotte by Ms. Kathy Rogers ("Rogers"). Id. In this position, Plaintiff completed various

4

administrative functions associated with tracking blocks of wireless phone numbers in North Carolina, South Carolina, and Virginia. (Document No. 66, p.4). In Charlotte, Plaintiff was first supervised by Rogers, and then by Ms. Sherry Melton ("Melton"), who remained her supervisor for the remainder of her employment with Defendant. (Document No. 66, p.4; Document No. 66-1, p.30).

Plaintiff was on paid medical leave from April 8, 2008, through July 1, 2008. (Document No. 66, p.5; Document No. 66-1, p.45; Document No. 66-2, p.128). Soon after returning to work, on or about August 5, 2008, Plaintiff was involved in a verbal confrontation with a female co-worker, Ms. Melissa Unger ("Unger"). (Document No. 66, p.5; Document No. 66-1, p.48; Document No. 66-2, p.130).

On or about August 7, 2008, Melton was informed by one of Plaintiff's co-workers that Plaintiff had sold two phones that she had bought through Verizon Wireless' Employee Phone Program ("EPP"). (Document No. 66, p.6; Document No. 66-2, p.70; Document No. 66-4, p.2). That same day, Melton contacted Verizon Wireless Human Resources Director, Ms. Terri Lassiter ("Lassiter"), regarding the incident. (Document No. 66, p.7; Document No. 66-4). Soon thereafter, area manager of the Compliance Department, Ms. Ronda Noland ("Noland"), was contacted, and an investigation was initiated to confirm the legitimacy of the allegations made against Plaintiff. (Document No. 66, p.7; Document No. 66-2, pp.70, 125-127; Document No. 66-4).

It was determined that Plaintiff had sold two discounted phones purchased through the EPP on eBay for profits of $96 and $105, respectively. Id. Apparently the phones Plaintiff bought and resold were never activated by Plaintiff, as required by the EPP. (Document No. 66, pp.6-7). In an email exchange **on August 11, 2008** between Defendant employees discussing Plaintiff's actions, Ms. Lori Seabrook from Human Resources noted that "in the past we have terminated or put

5

employees on Final Written Warning." (Document No. 66-4, pp.3-4). Plaintiff has never denied that she purchased handsets from the EPP and sold them on eBay. (Document No. 69-1, p.6). Moreover, it appears undisputed that Plaintiff accessed her eBay account from her work computer during work hours. (Document No. 66-1, p.52; Document No. 66-4; Document No. 65, p.2).

On August 12, 2008, Plaintiff "advised" Melton about the incident with Unger, but apparently did not have any further problems or confrontations with Unger. (Document No. 66, p.6; Document No. 66-1, p.48; Document No. 66-2, p.130). A couple of weeks later while Melton was on vacation, Plaintiff contacted Human Resources for the first time in her career. (Document No. 66, p.9; Document No. 66-2, p.131). On August 28, 2008, Plaintiff met with Lassiter and raised her concerns about "troubling failures to promote" and "Verizon's telephone number utilization reporting practices," and expressed frustration with Melton's "lack of action." (Document No. 22, p.13; Document No. 69-1, p.11). According to the Complaint, Plaintiff specifically complained to Lassiter

> that she was overqualified for her current position, received consistently positive performance evaluations, and was more qualified than other males that applied for and received many of the same promotion opportunities – yet she was never promoted . . . [and] regarding her good faith belief that Verizon knew or should have known that the large number of new accounts and telephone numbers being submitted to the FCC were false representations of actual cellular consumer accounts.

(Document No. 22, p.13). Plaintiff's notes provide that she and Lassiter

> [d]iscussed recent turn down of yet another position. Discussed being asked on a constant basis to perform duties well outside my realm of duties & that even when I expressed my frustrations to Sherry she would tell me to stop doing these "extra" things only to turn around and ask me to do them. Discussed issue about some team members.

(Document No. 66-2, p.131). Plaintiff has since admitted "that it appeared to her that Ms. Lassiter

6

did not understand her concerns about the complex details of the inventory issue." (Document No. 69-1, p.9). The next day Plaintiff left on a pre-scheduled vacation. (Document No. 22, p.14).

The parties disagree about the exact terms and conditions of the EPP Policy, and whether they were violated by Plaintiff's actions. After determining that Plaintiff did, in fact, sell her phones purchased through the EPP online, Noland and Lassiter notified additional members of the Compliance, Corporate Security, and the Human Resources departments. (Document No. 66-4). On September 8, 2008, Lassiter sent an email to Melton and others reporting that there was agreement that Plaintiff's actions were a "terminable offense." (Document No. 66-4, p.14). Specifically, Lassiter noted that:

> This is considered competing with the company which is a conflict of interest. The M&P clearly states when you purchase discounted phones through the employee program, you have to activate them on the employee plan. She sold and profited personally from a benefit of the company and took personal advantage of an opportunity that arose in the course of work which is against the code of conduct. She also accessed eBay and sold these items from her work computer while at work (it wasn't conclusive if she were on break or on lunch while she did this). Security did discover she accessed and surfed on eBay on 8/22 for at least 45 minutes to an hour from 8:15 to 9:15 which would not be considered a break or lunch.

(Document No. 66-4, p.14).

Plaintiff was terminated by Melton the next day, September 9, 2008. Id. Plaintiff was informed by Melton

> that she was being terminated because she violated Verizon Wireless "policy" by selling her cell phones three (3) months ago on the internet. Angela was told that Company "policy" expressly prohibits employees from selling their cell phones, purchased through the employee phone purchase program, on any third party auction web sites.

(Document No. 22, p.14).

Based on the foregoing, Plaintiff initiated the instant lawsuit on March 24, 2010. (Document No. 1). According to the Complaint, Plaintiff "applied for numerous promotions at Verizon, which she did not receive, Angela recalls specifically applying for approximately one promotion in 2007 and approximately three other promotions in 2008." (Document No. 22, p.4). Plaintiff contends that the positions she sought were filled by males and she concluded that "she was not promoted because of her gender." (Document No. 22, pp.4-5). Plaintiff contends that the males who were hired instead of her were less qualified, although she acknowledges that she was "frequently told that she 'didn't have enough experience' for the jobs or lacked the 'qualifications' to perform the job duties." (Document No. 22, p.5). Plaintiff concludes that she was more qualified than the new male employees because she participated in training and/or assisting them in their new positions. (Document No. 22, pp.5-6). It does not appear that Plaintiff has produced any objective evidence to support her opinion that she was more qualified than the male employees who received promotions she sought.

Plaintiff contends that she complained to her supervisor, Melton, "about the repeated failures to promote based on gender," although she does not state when she made that complaint. (Document No. 22, p.12). Plaintiff also allegedly expressed concerns to Melton and other Verizon officials

> regarding the high quantity of newly opened accounts coming from small, unknown "sub retailers" that were almost immediately cancelled and placed into the number bank in "pending active" status. Angela even stated, at one point, that Verizon Wireless' telephone number request process through the FCC equated to "lying to the government" and that "no one was listening to her" regarding the issue.

(Document No. 22, pp.12-13).

Plaintiff claims that she was fired "in retaliation for complaining about not being promoted

8

because of her gender as well as her raising 'red flags' to the possibility of an illegal scheme of resellers to obtain additional number inventory for which Verizon had to pay a premium that would also contribute to Verizon's ability to claim that Verizon had the most customers." (Document No. 69-1, p.7). Plaintiff contends that the reason she was given -- violation of the EPP Policy -- was routinely ignored and violated by Verizon employees, and was a mere pretext to cover up the fact that she was fired in retaliation. (Document No. 69-1, pp.7-10).

**B. Motion For Summary Judgment**

Viewing the evidence in the light most favorable to Plaintiff, and applying applicable authority, the undersigned is persuaded that Defendant's "Motion For Summary Judgment" should be granted based on the analysis set forth below.

    **1. Title VII Retaliation Claim**

In her first claim for relief, Plaintiff contends that she was unlawfully terminated pursuant to Title VII of the Civil Rights Act of 1964, because she complained that Defendant repeatedly failed to promote her based on her gender. (Document No. 22, pp.16-17). "Title VII of the Civil Rights Act of 1964 'prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, an unlawful employment practice.'" Orenge v. Veneman, 218 F.Supp.2d 758, 763 (D.Md. 2002) (quoting 42 U.S.C. § 2000e–3(a) (2000)).

> The McDonnell Douglas test is a proof scheme used to analyze Title VII cases. Under the test, a plaintiff alleging retaliation must first establish a prima facie case "by showing: (1) that the plaintiff was engaged in protected activity; (2) that the employer acted adversely against the plaintiff; and (3) that the protected activity was causally connected to the adverse action." Francisco v. Verizon South, Inc., 756 F.Supp.2d 705, 725 (E.D. Va. 2010) (citing Laughlin v. Metro. Washington Airports, 149 F.3d 253, 258 (4th Cir. 1998)). If the plaintiff makes out a prima facie case of discrimination, the burden of production shifts to the employer to state a legitimate non-discriminatory reason for its decision. Hoyle v. Freightliner,

9

> LLC, 650 F.3d 321, 336–37 (4th Cir. 2011). If the defendant does so, the McDonnell Douglas framework disappears and the remaining issue is whether intentional discrimination occurred. "'In other words, the burden shifts back to [the employee] to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

Ferrell v. Harris Ventures, Inc., 812 F.Supp.2d 741, 745 (E.D. Va. 2011).

In support of its motion for summary judgment, Defendant argues that Plaintiff cannot articulate a legally viable prima facie case of retaliation in violation of Title VII because she fails to meet the first and third prongs – a protected activity and a causal link. (Document No. 66, p.12). Defendant further argues that even if Plaintiff could establish a prima facie case of retaliation, her claim would ultimately fail because Defendant had a legitimate, nondiscriminatory reason for firing her and she lacks evidence permitting a reasonable fact finder to determine otherwise. (Document No. 66, p.19).

### a. Protected Activity

In order to satisfy the first prong of her prima facie case, Plaintiff must show that she engaged in protected activity under the Title VII. Opposition activities are protected by Title VII of the Civil Rights Act of 1964, and they include internal protests or complaints concerning an employer's discriminatory activities. EEOC v. Navy Federal Credit Union, 424 F.3d 397, 406 (4th Cir. 2005.); 42 U.S.C. § 2000e-3(a); (Document No. 66, pp. 12-13).

Defendant argues that this prong is not met because Plaintiff did not have an objectively reasonable belief that a Title VII violation had occurred, and therefore, her complaints do not constitute opposition activity. See (Document No. 66, p.13); Jordan v. Alternative Resources Corp., 458 F.3d 332, 339 ( 4th Cir. 2006). In support of this argument, Defendant points out facts that call

into question the objective reasonableness of Plaintiff's Title VII claim. (Document No. 66, pp.14-16). These include her complaints about not being promoted in the Murfreesboro, Tennessee office in 2003 during her first year of employment, although Verizon's policy is not to promote during the first year; her lack of knowledge of the gender and qualifications of successful applicants; the fact that her supervisor and many of the Human Resources and Compliance employees who played a role in her termination were female; and the fact that Plaintiff actually did receive several promotions during her tenure at Verizon. (Document No. 66, pp.3-4, 14-15). Defendant also argues that Plaintiff's statement that she was tired of watching promotions go to men whom she felt always needed her help is a vague statement that is insufficient to establish a protected activity under Title VII. (Document No. 66, p.14) (quoting Fletcher v. Philip Morris USA Inc., 2009 WL 2067807 (E.D. Va. July 14, 2009) ("Such general complaints do not implicate Title VII.")).

Plaintiff argues that she "observed male counterparts being promoted at much higher rates than herself" and that a male who secured a position that she had applied for was unable to perform his duties in the new role and consequently turned to her to assist him with his duties. (Document No. 69-1, p.12). She contends that the majority of the positions she applied for were given to male applicants, and she observed a "good old boys" club attitude at Verizon. (Document 69-1, p.13). Plaintiff also argues that the policy of not promoting within the first year was selectively enforced, and gives examples of two men who were purportedly promoted after less than one year in their current role. (Document 69-1, p.13). In short, Plaintiff concludes that she genuinely believed based on all relevant circumstances that a Title VII violation had occurred, and at the very least there is a genuine issue of material fact as to whether Plaintiff's belief was objectively reasonable and the first prong of the prima facie analysis was met. (Document No. 69-1).

    b. **Adverse Action**

Case 3:10-cv-00139-DCK   Document 82   Filed 09/26/12   Page 11 of 18

As for the second prong of the analysis, there is no dispute that there was an adverse employment action taken against Plaintiff – her termination on September 9, 2008.

### c. Causal Connection

With regard to the third prong, Defendant argues that no causal link existed between the discriminatory complaints and Plaintiff's firing. (Document No. 66, p.16). Defendant contends that Plaintiff has only articulated two specific complaints of discrimination. Id. First, she complained about the Murfreesboro Call Center as being a "good ole boys club" in 2003 and perhaps 2004 or 2005. Id. Defendant contends that the gap in time is too great to establish a causal link to her 2008 termination, and moreover, that Plaintiff provides no evidence that anyone involved in the decision to terminate her was aware of her complaints in Tennessee. (Document No. 66, p.17).

Second, Defendant observes that Plaintiff met for the first time in her career with Defendant's Human Resources personnel on August 28, 2008. Id. In that meeting, Plaintiff discussed her perceived gender discrimination, her conflict with Unger, the lack of action by Melton, and the number inventory issue. (Document No. 69-1, p.11). Defendant asserts that this second alleged expression of concern about discrimination is also insufficient to establish the requisite causal link. (Document No. 66, p.18).

Specifically, Defendant contends that "[t]o demonstrate the requisite 'causal link between the protected activity and the adverse employment action,' a plaintiff must generally show that at the very least the termination occurred *after* the decision-making authority became aware of the employee's grievance." (Document No. 66, p.18) (quoting Francisco v. Verizon South, Inc., 442 Fed.Appx. 752, 754 (4th Cir. 2011) (emphasis added) and citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)). Essentially, Defendant asserts that the decision to terminate Plaintiff was all but finalized *before* she even expressed her grievances. Defendant argues that the only

12

reason Plaintiff was not terminated prior to her August 28, 2008 meeting with Lassiter was that Melton, her supervisor and the ultimate decision maker, was on vacation. (Document No. 66, p.18); See (Document No. 66-4). In addition, Defendant argues that there is no evidence Melton knew about Plaintiff's complaints to Human Resources prior to the termination. (Document No. 66, p.19).

Defendant frames the firing as simply the ultimate outcome of an ongoing investigation of Plaintiff's online sales of phones bought under the EPP, beginning on or about August 7, 2008 (21 days before Plaintiff's complaints to Human Resources), and ending September 9, 2008, as soon as both Melton and Plaintiff were back at work after their respective vacations.

Plaintiff takes a different view. The crux of Plaintiff's argument is that the email chain did not demonstrate intent to terminate Plaintiff for selling her handsets on Ebay until after Plaintiff's complaints to Human Resources. (Document No. 69-1, p.19). Plaintiff claims that "the decision to terminate Angela was solely taken by Ms. Lassiter." Id. According to Plaintiff, the facts that "the request for termination came from the same person to whom [Plaintiff] complained, Ms. Lassiter, and the decision to terminate came after [Plaintiff's] complaint" shows enough of a causal link to satisfy the third prong of a prima facie case for retaliation in violation of Title VII. Id.

The undersigned finds that the evidence supports Defendant's arguments. In short, the email chain shows that: (1) on August 7, 2008, an investigation was initiated, apparently by Melton and Lassiter, into Plaintiff's purchase of phones through the EPP and subsequent involvement with eBay; (2) by August 11, 2008, participants in the investigation noted that "[a]ccording to HR in the past we have **terminated** or put employees on Final Written Warning"; (3) by August 27, 2008, Lassiter thought she had "enough with the information" from the investigation; and (4) on September 8, 2008, Lassiter reported to Melton that "all concurred this was a terminable offense." (Document No. 66-4) (emphasis added). It is noteworthy that not only did the investigation

13

conclude that Plaintiff's actions with the EPP phones violate the company's code of conduct, but also, that Plaintiff had spent work time surfing Ebay. (Document No. 66-4, p.14).

There is no evidence that Lassiter was the sole decision maker. To the contrary, the evidence is that Lassiter was involved in initiating an investigation weeks before she even met with Plaintiff, and that in the end she made a recommendation to Melton based on that investigation and in consultation with several other Verizon personnel. (Document No. 66-4). Despite her contention in her opposition brief (Document No. 69-1, p.19) that it is clear that the decision to terminate was solely Lassiter's, Plaintiff's deposition testimony indicates that she actually does not know who made the decision:

> Q. Sitting here today, could you tell me who made the decision to actually terminate you from Verizon Wireless?
>
> A. I do not know who ultimately made the decision, no.
>
> Q. So sitting here today, you can't even tell me that those people would even know about your complaints of gender discrimination or your supposed whistle-blowing activities, correct?
>
> A. I can't speculate on what they do or do not know.

(Document No. 66-1, pp.77-78).

At most, the temporal proximity between Plaintiff's conversation with Lassiter on August 28, and her termination within hours of her return to work on September 9, 2008, could provide some circumstantial evidence to support her argument for a causal link. Francisco v. Verizon South, Inc., 756 F.Supp.2d 705, 725 (E.D. Va. 2010). However, Plaintiff has failed to show that Melton was aware of Plaintiff's complaints to Human Resources when she was terminated. Id. In fact, there is no evidence that any of the personnel involved in the investigation or recommendation, other than Lassiter, had any knowledge of Plaintiff's complaints.

14

The undersigned further notes that by her own characterization of the meeting, Plaintiff had several complaints she shared with Lassiter on August 28, 2008. (Document No. 69-1, p.11). Plaintiff has failed to show any evidence , or even to speculate, as to why Lassiter allegedly sought to terminate Plaintiff based on her complaint of perceived gender discrimination. First, there is compelling evidence that the decision to terminate was under way well before Plaintiff articulated any complaints to Lassiter. Next, Lassiter and Melton are both women with no apparent motivation to discriminate against another woman based on her gender. As Defendant points out, Plaintiff has failed to offer any evidence suggestive of discriminatory or retaliatory animus at any point during her employment with Verizon. (Document No. 72, p.8). Finally, it is undisputed that Plaintiff began complaining about failures to promote years before, in her first few months of employment with Defendant, and that similar complaints continued throughout the course of her employment. In spite of these numerous complaints, she was repeatedly promoted.

Based on the foregoing, the undersigned is not persuaded that Plaintiff met her burden to establish a prima facie case of retaliation. Assuming Plaintiff engaged in protected activity, she has not established a sufficient causal connection between that activity and her ultimate termination. Even if Plaintiff were able to establish a sufficient prima facie case of retaliation, the undersigned is satisfied that Defendant has stated a legitimate non-discriminatory reason for its decision to terminate Plaintiff.

Defendant argues that Plaintiff was fired for the simple, non-retaliatory reason that she violated company policy by selling phones bought through the EPP on Ebay. The parties disagree about what the policy and practice of the Defendant was regarding the EPP. However, even if there is ambiguity, or even inconsistency, in the application of Verizon's rules, the undersigned is satisfied that Defendant's reasons for termination were non-discriminatory. "Where an employer gives a

legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" Francisco v. Verizon South, Inc., 756 F.Supp.2d 705, 725 (E.D. Va. 2010) (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000)).

Put simply, Plaintiff has failed to show that the reason stated by Defendant was not the real reason for her discharge. See Hawkins, 203 F.3d at 279. Even if Plaintiff had established a prima facie case here, she has failed to meet her burden of proving by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination. See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). The Fourth Circuit's finding in Williams v. Cerberonics is instructive on this issue:

> As discussed above, [Defendant] has articulated and proven legitimate nondiscriminatory and nonretaliatory reasons for [Plaintiff's] termination. Other than the fact that at the time she was fired her supervisors were aware that she had filed a discrimination claim, [Plaintiff] has produced no other evidence of retaliation. Plainly, mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee. Again, a trial court's determination on the legitimacy of an employer's motives for taking an adverse employment action is essentially one of fact that we will not overturn unless clearly in error..

Williams v. Cerberonics, 871 F.2d 452, 457 (4th Cir. 1989). In Williams, the plaintiff's termination was upheld even though the employer had knowledge of a discrimination charge and the plaintiff had made a prima facie case of retaliatory discharge, because Defendant had shown nondiscriminatory and nonretaliatory reasons for the termination. Id.

As in Williams, Defendant here has shown a legitimate nondiscriminatory and nonretaliatory reason supported by evidence for terminating Plaintiff that Plaintiff has failed to rebut. As such,

16

Defendant's motion will be granted.

### 2. Wrongful Discharge Claim

In her remaining claim for relief, Plaintiff asserts that she was terminated, in whole or in part, for complaining about allegedly unlawful activities by Defendant that violated North Carolina public policy. (Document No. 22, pp.20-21). Specifically, Plaintiff complained that Defendant

> obtained large blocks of telephone numbers, to the benefit of Defendant, to the exclusion of North Carolina competitors, and at a cost to North Carolina consumers, by false pretenses, when it: engaged in representations of subsisting facts, which were calculated and intended to deceive, which did in fact deceive, and which Defendant obtained or attempted to obtain value.

(Document No. 22, p.21).

"Ordinarily, an employee without a definite term of employment is an employee-at-will and may be discharged for any reason." Crespo v. Delta Apparel, Inc., 5:07CV065-RLV, 2008 WL 2986279 at *4 (W.D.N.C. July 31, 2008) (quoting Coman v. Thomas Manuf'g Co., 325 N.C. 172, 175 (1989)) (citations omitted). However, the North Carolina Supreme Court recognizes an exception to the general employee-at-will rule where discharge of an employee contravenes North Carolina public policy. Id.

> While no North Carolina court has expressly identified the essential elements (at least in list form) for such a cause of action, the elements of a claim alleging wrongful discharge in violation of public policy, generally, are described as: (1) the plaintiff was an at-will employee of the defendant; (2) the defendant terminated the plaintiff; (3) there was a public policy applicable to the circumstances of the termination; (4) the plaintiff was protected by this public policy; and (5) the defendant's motivation in terminating the plaintiff violated this public policy.

Crespo, 2008 WL 2986279 at *5.

Based on the preceding analysis of the Title VII claim, the undersigned is satisfied that

17

Plaintiff was terminated by Defendant based on its conclusion that Plaintiff had violated its internal policies and/or code of conduct. As such, the undersigned is not persuaded that Plaintiff was terminated for complaining about allegedly discriminatory practices or for complaining about practices alleged to violate North Carolina public policy. Even viewing the evidence in the light most favorable to Plaintiff, she has failed to set forth specific facts showing there is a genuine issue for trial on her claim for wrongful discharge in violation of public policy. As such, the undersigned finds that further analysis of Plaintiff's final claim is unnecessary.

After careful consideration of the parties' briefs, as well as their oral arguments at the motion hearing on August 30, 2012, the undersigned finds that Defendant's motion should be granted.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's "Motion For Summary Judgment" (Document No. 65) is **GRANTED**.

Signed: September 26, 2012

David C. Keesler
United States Magistrate Judge